UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| K.A.B., | ) | |
| by Melanie Bilodeau, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.18-30174-KAR |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION
FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 14 & 16)

ROBERTSON, U.S.M.J.

Before the court is a request for judicial review of a final decision by the Commissioner

of the Social Security Administration ("Commissioner") regarding the plaintiff's entitlement to

Supplemental Security Income ("SSI"). Plaintiff Melanie Bilodeau ("Plaintiff"), as legal

guardian and grandmother of K.A.B. ("B."), asserts that the Commissioner's decision denying B.

SSI benefits, which denial was memorialized in a November 9, 2017 decision by an

administrative law judge ("ALJ"), should be reversed. Plaintiff has filed a Motion for Judgment

on the Pleadings (Dkt. No. 14), while the Commissioner has filed Defendant's Motion for Order

Affirming the Decision of the Commissioner (Dkt. No. 16), in which the Social Security

Administration ("SSA") argues that the Commissioner's decision was supported by substantial

evidence.

The parties have consented to this court's jurisdiction (Dkt. No. 13). *See* 28 U.S.C. §

636(c); Fed. R. Civ. P. 73. For the reasons set forth below, the court will grant Plaintiff's motion

in part and deny the Commissioner's motion.

I.    PROCEDURAL BACKGROUND

B. applied for SSI on June 13, 2013 (Dkt. No. 11, Administrative Record ("A.R.") 276-

85). The limitations identified by B.'s guardian in June 2013 in connection with the application

included the following. B.'s guardian was "not sure" whether B.'s ability to communicate was

limited, but stated that B. was unable to deliver telephone messages, repeat stories she had heard,

tell jokes or riddles accurately, or explain why she did something (A.R. 300). B.'s ability to

progress in learning was limited. She could not read capital letters, small letters, or simple

words, or read and understand stories in books or magazines. She could not write in longhand or

understand money well enough to make correct change (A.R. 301). B.'s impairment affected her

behavior with other people in that she did not have friends her own age and could not make new

friends (A.R. 303). B.'s guardian was "not sure" whether B.'s impairments affected her ability

to help herself and cooperate with others in taking care of her personal needs, but B. could not tie

shoelaces, take a bath or shower without help, comb, brush, or wash her hair, pick up and put

away her toys, hang up her clothes, help with chores around the house, or do what she was told

to do most of the time (A.R. 304). B.'s ability to pay attention and stick to a task was limited.

She did not finish what she started, complete homework, or complete her chores most of the time

(A.R. 305).

The application was denied initially and on reconsideration. In December 2014, B.

attended a hearing before an ALJ, after which an unfavorable decision was issued on January 29,

2015. On appeal, the recording of the hearing was found to be inaudible, and the Appeals

Council remanded the case for a second hearing. Following a second hearing on April 21, 2017, a different ALJ found that B. was not disabled. The Appeals Council declined review. The appeal before this court followed.

II.    LEGAL STANDARDS

A. Disability Determination

The Social Security Act ("SSA") defines a child under the age of eighteen as disabled if the child "has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death or to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). When a claim for benefits is made on behalf of a child under the age of eighteen, the Commissioner must determine whether the child's alleged impairment is severe. *See* 20 C.F.R. § 416.924(a)(c). If an impairment is found to be severe, "the question becomes whether the impairment is one that is listed in, or medically or functionally equals, the Listings." *Blackmore ex rel. JS v. Astrue*, Civil No. 09-385-P-S, 2010 WL 2674594, at *1 (D. Me. June 29, 2010), *adopted*, 2010 WL 2899704 (D. Me. July 19, 2010) (citing 20 C.F.R. 416.924(a)).

The Commissioner applies a three-step process to determine whether a child is eligible for SSI benefits on the basis of disability. 20 C.F.R. § 416.924.

> First, it must be determined whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). If not, the second step requires a determination of whether the child's impairment or combination of impairments is "severe". A child's impairment that is so "slight" as to cause no more than minimal functional limitations is not "severe" and such a child is not disabled under the Act. 20 C.F.R. § 416.924(c).

> Finally, the third step requires a determination of whether the impairment meets or medically equals in severity the criteria for an impairment listed in the "Listing of Impairments" in Appendix 1 of Subpart P of the Commissioner's disability regulations, 20 C.F.R., Part 404, or whether the impairment is functionally equal in severity to a listed impairment. If the child does not have an impairment which

medically meets or equals the listed impairments, or is functionally equivalent in severity to a listed impairment, he will be found to be "not disabled". 20 C.F.R. § 416.924(d).

*Beliveau ex rel. Beliveau v. Apfel*, 154 F. Supp. 2d 89, 93 (D. Mass. 2001).

"Functional equivalence," the method of analysis employed by the ALJ in this case, is evaluated "in terms of six domains." 20 C.F.R. § 416.926a(b)(1). They are:

1. Acquiring and using information;

2. Attending to and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for oneself; and

6. Health and physical well-being.

*See* 20 C.F.R. § 416.926a(b)(I). "To functionally equal the listings, an impairment(s) must be of listing-level severity; that is, it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." Social Security Ruling 09-1p, 2009 WL 396031, at *1 (Feb. 17, 2009) ("SSR 09-1p").

The child has a "marked" limitation – i.e., one "that is 'more than moderate' but 'less than extreme'"– when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). The child has an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

*Costa ex rel. X.C. v. Colvin*, C.A. No. 15-540ML, 2016 WL 7974120, at *5 (D.R.I. Dec. 21, 2016), *adopted*, 2017 WL 354284 (D.R.I. Jan. 24, 2017).

The functional equivalence rules require the Commissioner to consider how a child seeking SSI benefits "functions every day and in all settings compared to other children the same

age who do not have impairments."  SSR 09-1p, 2009 WL 396031, at *2.  An ALJ is required to evaluate the "whole child" when making a functional equivalence finding.  *Id.*

B.  Standard of Review

A court's standard of review of a decision by the Commissioner does not change when the claimant is a minor.  *See Miller ex rel. K.M. v. Astrue*, Civil Docket No. 2009-12108-RBC, 2011 WL 2462473, at *7-8 (D. Mass. June 16, 2011).  A court may not disturb the Commissioner's decision if it is grounded in substantial evidence and based on the correct legal standard.  *See* 42 U.S.C. § 1383(c)(3); *see also Smith v. Astrue,* 851 F. Supp. 2d 305, 307 (D. Mass. 2012).  A court must uphold the findings of the Commissioner "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'"  *Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir. 1981)).  "It is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  The resolution of conflicts in the evidence is for the [Commissioner], not the courts."  *Ortiz,* 955 F.2d at 769 (citing *Rodriguez,* 647 F.2d at 222).  "Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusions.'"  *Greene v. Astrue*, Civil Action No. 11-30084, 2012 WL 1248977, at *1 (D. Mass. April 12, 2012) (quoting *Ortiz,* 955 F.2d at 769). That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).

III.    RELEVANT FACTS[1]

A.  Educational Records

In December 2011, B.'s kindergarten teacher referred her for a psycho-educational evaluation because of concerns about B.'s memory for directions and story content and weak peer relations (A.R. 348-52).  The evaluation, conducted by Jean Kuhn, NCSP, noted that B. had been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), for which she took medication.  Ms. Kuhn observed that B. saw the school adjustment counselor and received services four times a week from a reading specialist.  The testing placed B. in the average range for cognitive ability, revealing a particular strength in concept formation and rapid decision making.  Overall, the tests placed B. in a solidly average range, with a weakness in learning and remembering symbolic information (A.R. 352).  The ultimate determination of the evaluation was that B. appeared to have the skills associated with the ability to learn, but that she would need continued classroom support and accommodation for her particular areas of need, which were learning and remembering symbolic information and forming and developing social relationships with her peers.

In January and February 2012, Julie Reiss, M.A., CCC-SLP, administered a speech and language evaluation after B.'s kindergarten classroom teacher expressed further concerns about B.'s inability to retain information (A.R. 344-47).  The testing revealed that B. "may not have the skills to remember spoken directions and/or academic instruction of increasing complexity as well as the ability to learn new vocabulary and subject content" (A.R. 345).  B. scored within the average range for other measurements, such as formulating sentences, sentence structure, and

---

[1] On appeal, B. does not challenge the ALJ's findings regarding certain physical impairments. Accordingly, the court does not refer to records related to those impairments.

working memory.  Because of B.'s "low average skills in the areas of expressive language and language content," Ms. Reiss recommended classroom accommodations such as breaking down auditory instructions into smaller components and frequent repetition (A.R. 347).

In April 2013, Ms. Reiss conducted a second speech and language evaluation for B. (A.R. 342-43).  The evaluator noted that although it occasionally took B. longer than normal to retrieve a word, her expressive vocabulary skills were age appropriate.  Ms. Reiss also noted difficulty in word finding with nouns and categories, which was helped with phonemic cuing.  B.'s teacher reported that B. always had trouble remembering what people said, following directions, and explaining what was read.  Ms. Reiss found that testing revealed a moderate word finding disability that would benefit from accommodations in the classroom and speech therapy.

On May 8, 2013, B.'s guardian consented to the individualized education program (IEP) developed by the school (A.R. 354-67).  The IEP covered the years 2013-14, the second half of B.'s first grade year and the first half of second grade.  With respect to academic performance, the IEP addressed B.'s limitations with rapid naming and memory for naming symbols with a plan that included individualized instruction and leveled text (A.R. 356).  The IEP also noted B.'s difficulty in establishing social boundaries and positive peer interactions, which impacted her performance at school.  The IEP goal was to have B. practice empathy, resolving conflicts, and engaging in reciprocal conversations and activities (A.R. 359).  Overall, the IEP authorized the delivery of special education services in language arts and speech and language as well as counseling (A.R. 361).

On September 6, 2013, B.'s first grade teacher completed a teacher questionnaire covering the previous academic year (A.R. 321-28).  This form asked the teacher to evaluate the student's problems in the six domain areas the SSA uses to evaluate a child's functioning.  The

teacher noted that B. had problems, varying from slight to serious, in acquiring and using information, most notably in "[p]roviding organized oral explanations and adequate descriptions" (A.R. 322), although B. was receiving extra support for English language arts from the special education department for this shortcoming. B. also had serious problems in attending to and completing tasks, as well as in interacting with others. In particular, she struggled with carrying out multiple step instructions and expressing her thoughts and ideas in everyday conversation. On occasion, the teacher remarked, B. had to be removed from the classroom for a time out (A.R. 324). B.'s first grade teacher also remarked that the child was "very hyper, crawling out of skin" (A.R. 327).

On February 7, 2014, B.'s second grade teacher, Cynthia Dienard, filled out a teacher questionnaire (A.R. 399-406). She noted that B.'s instructional level for reading was kindergarten level; her written language was slightly below grade level; and her math was at grade level (A.R. 399). Ms. Dienard reported few problem areas across all six domains with the exception of an obvious problem in expressing ideas in written form in the domain of acquiring and using information, and a very serious problem in completing homework assignments in the domain of attending to and completing tasks. The teacher did not find significant problems in interacting and relating with others, though she remarked that B. was a "loner" (A.R. 402) and that B.'s personal hygiene could be "problematic" at times (A.R. 404).

An April 4, 2014 IEP progress report detailed B.'s development in her three goal areas of language arts, social and emotional development, and speech and language from June 2012 through March 2014. In December 2013, the progress note was to the effect that B. had matured with respect to her interactions with peers and adults. The report outlined progress in second grade in reading independently, literal comprehension, and growth in writing by March 2014

(A.R. 659).  By April 2014, B.'s development in speech therapy was noted to be progressing well in both individual and group sessions (A.R. 662).

On May 5, 2014, B.'s school adjustment counselor, Beth Gordon, LICSW, wrote a letter advocating for B. to be given a voucher to participate in a YMCA summer camp.  Ms. Gordon stressed B.'s need for the structure and continuity that would be provided by summer programming (A.R. 671).

In December 2014 and January 2015, Erica Bell, M.S., CCC-SLP, conducted a communications assessment of B. as part of a three-year re-evaluation of speech services in her IEP (A.R. 757-63).  B.'s third grade teacher, Mia Chartrand, reported that B. often had difficulty using a variety of vocabulary words and thinking of the right word to use, explaining what she read and following written directions, and writing in detail (A.R. 757).  B. tested within average bounds in all areas except for recalling sentences, where she tested below average (A.R. 762). Ms. Bell concluded that "[b]ased on the results of this assessment, [B.] appears to be a candidate for dismissal from special education services in the area of speech and language" (A.R. 762). The assessment nonetheless provided strategies for B.'s learning environment to accommodate the difficulties she exhibited (A.R. 762-63).

In January 2015, when B. was a nine-year-old third grader, Ms. Kuhn conducted another psycho-educational evaluation of her (A.R. 416-419).  Ms. Kuhn noted that, although B. had made progress, she continued to have difficulty in language and language arts as well as with sadness and anxiety.  On cognitive ability testing, B.'s scores ranged widely from above average in working memory to below average in verbal comprehension, fluid reasoning, and processing speed (A.R. 417).   Ms. Kuhn remarked that B. continued to be challenged in the areas of comprehension and vocabulary and suggested that B. needed continued services to address these

weaknesses.  In addition to recommending certain classroom accommodations, such as direct teacher guidance and rephrasing and repetition of new material, Ms. Kuhn advised that B. continue to receive counseling support at school for dealing with her emotions.

Also in January 2015, Stacey Ashley, M.Ed., conducted an educational evaluation of B. (A.R. 421-24).  In the Woodcock Johnson IV Test of Achievement, B. scored in the average to low average range on all measurements with the exception of passage comprehension, where she fell just below the average range.  In her summary, Ms. Ashley recommended that B. continue to receive special education services in the English language arts and that the addition of services for math should be considered (A.R. 424).

After B.'s annual IEP meeting on February 2, 2016, the school proposed a new fourth grade IEP for B. (A.R. 427-44).  The reason for the IEP was that "[o]verall ratings put her in the significant range of concern" in areas of "working memory, monitor, inhibit, initiate, plan/organize and organization" (A.R. 428).  Based on her improvement, the school recommended dismissing B. from speech and language services.  The school concluded that, because of her ADHD and executive functioning disabilities, B. qualified for continued special education services in English language arts and for new services in history and social studies and math.  Due to her difficulties with "establishing social boundaries and positive peer interactions" which impacted her education, the IEP also authorized continued one-on-one counseling sessions.

When B.'s special education teacher, Bob Smith, filled out a teacher questionnaire on March 22, 2017 (A.R. 464-71), he stated that in the domain of acquiring and using information, B. had obvious problems in reading and comprehending written material, expressing ideas in written form, and recalling and applying previously learned material, a serious problem in

comprehending and doing math problems, providing organized oral explanations, and learning

new material, and a very serious problem in applying problem solving skills in class discussions

(A.R. 465). B. had obvious problems in attending to and completing tasks, with deficiencies in

carrying out single-step and multi-step instructions, and in focusing and refocusing on tasks,

completing homework and class work assignments, working without distracting herself or others,

and working at a reasonable pace (A.R. 466). Mr. Smith concluded that B. needed the services

in her IEP through sixth grade and would need additional support for reading comprehension.

B.'s fifth grade teacher, Kristen Heath, completed a teacher questionnaire on May 1,

2017 (A.R. 500-07). She noted that, with support, B. was reading at a beginning fourth grade

level near the end of fifth grade, was below grade level in math, and was approaching the

benchmark standard in writing (A.R. 500). In the domain of acquiring and using information,

she rated B. as having obvious problems in comprehending and doing math problems, expressing

ideas in written form, recalling and applying previously learned material, and applying problem-

solving skills in class discussions, and a serious problem in reading and comprehending written

material (A.R. 501).

B.'s school conducted a reevaluation of B.'s IEP for her fifth to sixth grade year in

January 2017 (A.R. 472-485). The findings were that B. had below average scores in verbal

comprehension, fluid reasoning, processing speed, oral vocabulary, story recall, and executive

functioning. The IEP authorized maintaining small group instruction for the general curriculum

areas and individual counseling sessions at school.

B.  Behavioral Health Records

On April 16, 2013, B. began treatment at Brightside for Families and Children

("Brightside") after a referral from B.'s school adjustment counselor (A.R. 515). At intake, it

was noted that B. had difficulties with reading, writing, and making friends (A.R. 517). The mental health exam results were that B.'s presentation fell within normal limits (A.R. 522), and the form listed her diagnoses as ADHD and posttraumatic stress disorder ("PTSD") (A.R. 525). The treatment goals were to decrease B.'s hyperactivity and help her guardian to control B.'s behaviors in the home and to understand B.'s developmental capabilities (A.R. 527-30). Brightside recommended weekly in-home therapy and individual therapy. On April 17, 2013, B.'s in-home therapist, Pamela Krzyzek, LICSW, completed an individualized action plan, revising the goals to decreasing B.'s anxiety and improving her coping skills, particularly around what triggered her anger at home; improving family communications, with a focus on helping family members identify breakdowns in communication patterns; and coordinating with B.'s school because she continued to struggle there (A.R. 513).

In July 2013, Ms. Krzyzek noted that B.'s memory problems hindered her coping skills (A.R. 542-544). B.'s diagnoses were listed as unspecified hyperkinetic disorder, PTSD, and learning difficulties. As B.'s therapist, Ms. Krzyzek was working to decrease B.'s anxiety and increase her coping skills (A.R. 810).

In an October 16, 2013 form, Ms. Krzyzek noted that B. had ADHD, delays in receptive and expressive language, executive functioning deficits, social/emotional issues around self-esteem and a history of trauma and loss, and self-care issues (A.R. 596-97). B.'s treatment involved in-home therapy services, individual therapy, and behavioral and neuropsych referrals. In early 2014, Ms. Krzyzek's progress report on B. reflected no changes in B.'s progress or treatment (A.R. 596-601).

In late December 2013, Robert Ferguson, Ph.D., and Samantha Hague, Psy.D. Intern, conducted a neuropsychological evaluation of B. (A.R. 385-97). The examiners found that B.'s

general ability index, representing acquired knowledge and fluid reasoning, and her verbal comprehension index, representing verbal concept formation and verbal reasoning, were low average. Other areas measured, such as working memory index and cognitive proficiency index, were average. B.'s weaknesses contributed to her "difficulties in completing multi-step directions and following a daily routine" (A.R. 394). Ultimately, the examiners determined that B.'s symptoms met the proposed criteria for Developmental Trauma Disorder, as well as ADHD and generalized Anxiety Disorder (A.R. 394-95). Their recommendations included specific school accommodations, guidance for homecare, and services such as tutors or resource teachers, social and recreational programs, and play therapy (A.R. 396).

Brightside progress notes from January through April 2014 noted no changes in goals or services (A.R. 665-669). Brightside progress notes for April through July of 2014 noted continued work with B. on coping strategies for her emotions and that B. continued to struggle in school (A.R. 745-53). Notes from December 2014 through January 2015 remarked on B.'s high anxiety around visits with her biological mother (A.R. 754).

In mid-May 2014, B.'s pediatrician, Cherrie Chua, M.D., and Ms. Krzyzek recommended a day care program for after school and during the summer because B. needed daily structure (A.R. 673, 675).

On November 11, 2014, Ms. Krzyzek informed the Office of Disability Adjudication that B. had ADHD, PTSD, anxiety disorder, and a seizure disorder (A.R. 722). Ms. Krzyzek reported that the school's IEP helped address B.'s learning disabilities. To continue making improvements, B. required high structure and consistency throughout the day and wrap around services.

On July 8, 2016, Alyson Marx, Psy.D., and Dr. Ferguson issued a report about a second neurological evaluation of B., who had just completed fourth grade (A.R. 765-778). The report noted that B.'s guardian felt that B's forgetfulness, difficulty retaining information and following through on tasks were getting worse and affected information that should be very familiar (A.R. 765). Increased anxiety had emerged two years earlier around problems with B.'s biological mother. The report noted B.'s receipt of IEP services since first grade for reading, speech and language and math, as well as school counseling because B. was defiant and rude at school (A.R. 767). The teacher questionnaire reported that B.'s performance at school ranged from weak to poor. B.'s social relationships at school improved over the year. The report concluded that overall, B.'s intellectual functioning was average, though variable across indices (A.R. 775). The examiners felt that B.'s weaknesses in verbal reasoning and language, as well as verbal memory, likely impacted how B. interacted with her environment, especially in learning. Her ADHD appeared well managed by her medication. The report concluded that B.'s diagnostic formulation was ADHD and Adjustment Disorder with anxiety (A.R. 776). B.'s executive functioning difficulty interfered with her academic and household tasks.

Ms. Krzyzek reported on her in-home therapy work with B. from December 12, 2014, through March 3, 2017, stating that B.'s anxiety was higher when there were disputes with her biological mother and decreased slightly when the custody dispute was resolved against the mother (A.R. 782-799). Memory problems continued to hinder B.'s retention of skills to perform daily tasks.

Treatment records of B.'s visits to her pediatrician, Dr. Chua, from January 14, 2015 to December 15, 2016, generally reported B. doing well in school with her IEP, having friends, and sleeping well. The notes consistently record an assessment of ADHD. Dr. Chua declined to

prescribe medication for anxiety because B.'s anxiety appeared related to problems with her biological mother (A.R. 825).  Occasional sleep disruption was also noted (A.R. 822).

C.  Opinion Evidence

On December 9, 2013, when B. was eight years old, Disability Determination Services ("DDS") conducted a records review in B.'s case, concluding that she was not disabled (A.R. 103-15).  The DDS findings were that B.'s ADHD and speech and language impairment were severe impairments, but neither, alone or in combination, met or medically equaled or functionally equaled impairments in the listings (A.R. 110).  In the domain evaluation, B. was assessed to have less than marked limitations in acquiring and using information, attending and completing tasks, and interacting with others.  She was assessed as having no limitations in moving about and manipulating objects, caring for herself, or health and physical well-being.

On reconsideration, Tina Adams, Ph.D., also found B.'s speech and language impairment and ADHD to be severe impairments (A.R. 117-133).  Dr. Adams' findings were consistent with the initial ratings across the six domain areas, with the exception that Dr. Adams assessed B. with a limitation that was "less than marked" instead of "no limitation" in the domain of caring for herself.  While noting B.'s serious problems with completing homework, expressing ideas in written form, and taking care of personal hygiene, and slight problems in several areas, including paying and sustaining attention, carrying out multi-step instructions, and playing cooperatively with other children, Dr. Adams concluded that B. was making progress with her current treatment regime and IEP services (A.R. 130).

A February 13, 2017 letter from Dr. Chua, Plaintiff's treating pediatrician, written when B. was twelve and a half years old years and addressed "[t]o whom it may concern," described B. as struggling in school.  Dr. Chua noted that a recent neuropsychiatric evaluation showed that B.

had weaknesses in language comprehension and processing speed. She was unable to describe the meaning of words and to identify pictures. When she read, she had a hard time understanding the topic and when she was spoken to, she sometimes did not understand what was being said to her. Problems with recall made her slower than her peers in acquiring new information. Her executive functioning was below average for her age and her anxiety level was high because of the many problems she had encountered in her life (A.R. 802).

D. Hearing Testimony

At the April 21, 2017 hearing, B., her grandmother and guardian, Ms. Bilodeau, and B.'s therapist, Pamela Krzyzek, testified (A.R. 50-92). B. spoke about having trouble with her homework and how her grandmother needed to remind her over and over again to do her chores (A.R. 64).

B.'s grandmother testified that B. was pulled out of her fifth-grade class for reading, math, and English for individual tutoring (A.R. 68). She had many incompletes on assignments. B.'s teachers commented that B. did not sit still and struggled in getting along with her peers (A.R. 69, 80). At school, the teachers kept B. under supervision at all times. She was not allowed to go to the bathroom by herself. B. did not appear to have friends, and she played the same position every basketball season because she could not retain the rules that applied to different positions (A.R. 82).

B. rarely slept through the night and was not rested upon waking in the morning (AR. 74-75). When B.'s ADHD medication wore off after school, she could not focus or sit still. B. did not get along with her grandmother's teenage daughter because B. did not respect boundaries (A.R. 81). Ms. Bilodeau had to supervise B. carefully when B. did chores because she did not retain information or follow directions (A.R. 71-72). The grandmother put post-it notes all over

the house to remind B. of the rules, where the dishes went, and where the things in her room should go (A.R. 81).

Ms. Krzyzek testified that she began working with B. to address her ADHD and social anxiety. Subsequently, B.'s issues were identified as a delay in processing language and social cues and social language (A.R. 85-86). Ms. Krzyzek saw B. once or twice a week and was on call for the family around the clock. She testified that B.'s memory problems were such that she was unable to remember simple routines. She observed that B. did not care for herself, particularly as to bathing (A.R. 88). The school had a good understanding of B.'s deficits, but it was unlikely B. could be brought to grade level (A.R. 89).

E.  The ALJ's Decision

The ALJ followed the required three-step sequential evaluation in determining whether B. was disabled. He found that B. was a preschooler on May 16, 2013, the date the application was protectively filed, and a school-aged child at the time of the decision. At the first step, he found that B. had not engaged in substantial gainful activity since the application date. At the second step, the ALJ found that B.'s ADHD and sleep disorder/obstructive sleep apnea were severe impairments. The ALJ considered whether B.'s ADHD met the severity requirements of the listing, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part B § 112.11, and concluded that it did not meet or equal the severity requirements of Listing 111.09 (communication impairment) or Listing 112.11 (ADHD) (A.R. at 30).

At the third step – assessing functional equivalency – the ALJ found that B. had: (1) a less than marked limitation in acquiring and using information; (2) a less than marked limitation in attending to and completing tasks; (3) no limitation in interacting and relating with others; (4) no limitation in moving about and manipulating objects; (5) a less than marked limitation in the

ability to care for herself; and (6) no limitation in health and physical well-being. He therefore concluded that B. had not been under a disability from the date of filing through the date of his decision. *See Costa*, 2016 WL 7974120, at *8; *Miller ex rel. K.M.*, 2011 WL 2462473, at *15.

IV.    ANALYSIS

Plaintiff argues that the ALJ erred in not finding B.'s anxiety disorder to be a severe impairment, in rejecting treating source opinions on the basis that they "were solicited to accommodate [B.'s] application" for benefits, and in not giving these treating source opinions appropriate weight  (A.R. 34; Dkt. No. 15 at 12-16).  In the court's view, the ALJ's error in his treatment of opinion evidence from Plaintiff's treating pediatrician and other care providers was compounded by other errors and omissions in the opinion, and these errors, considered cumulatively, require remand.

The ALJ "gave no significant probative weight" to letters from Dr. Chua, B.'s treating pediatrician (A.R. 673), Ms. Krzyzek, her social worker and clinical case worker, who provided counseling to B. and her family members (A.R. 675, 722, 780), and Ms. Gordon, B.'s school adjustment counselor (A.R. 671), and included no reference to a February 13, 2017 letter from Dr. Chua, which described the results of neuropsychiatric testing and B.'s significant learning deficits vis-à-vis her peers (A.R. 802).  He discounted the significance of this evidence on the grounds that opinions from these treating care providers were "solicited to accommodate this application" for social security benefits and because the opinions were from "less than acceptable medical sources" (A.R. 34-35).

"It is improper to discount a treating source's opinion simply because it was solicited." *Gonzalez v. Astrue*, Civil Action No. 11-30201-KPN, 2012 WL 2914453, at *3 (D. Mass. July 5,

2012) (citing *Gonzalez Perez v. Sec'y of Health & Human Servs.*, 812 F.2d 747, 749 (1st

Cir.1987)).

> When weighing any medical opinion, an ALJ should consider: (1) the length of
> the treatment relationship and the frequency of examination; (2) the nature and
> extent of the treatment relationship; (3) the supportability of the opinion; (4) the
> consistency of the opinion with the record as a whole; (5) the specialization of the
> medical source who provided the opinion; and (6) other factors. Finally, when
> explaining the amount of weight that he gives to the opinion of a treating source,
> an ALJ must "give good reasons." 20 C.F.R. § 404.1527(c)(2). Moreover, "to
> meet the 'good reasons' requirement, the ALJ's reasons must be both specific, *see
> Kenerson v. Astrue*, 10-cv-161-SM, 2011 WL 1981609, at *4 (D.N.H. May 20,
> 2011) (citation omitted), and supportable, *see Soto-Cedeño v. Astrue*, 380 F.
> App'x. 1, 4 (1st Cir. 2010). In sum, the ALJ's reasons must "offer a rationale that
> could be accepted by a reasonable mind." *Widlund v. Astrue*, No. 11-cv-371-JL,
> 2012 WL 1676990, at *9 (D.N.H. Apr. 16, 2012) (citing *Lema v. Astrue*, C.A. No.
> 09-11858, 2011 WL 1155195, at *4 (D. Mass. Mar. 21, 2011), *report and
> recommendation adopted by* 2012 WL 1676984 (D.N.H. May 14, 2012). *Jenness
> v. Colvin*, No. 15-cv-005-LM, 2015 WL 9688392, at *6 (D.N.H. Aug. 27, 2015).

> \*\*\*

> While there are good reasons not to give controlling weight to a treating source's
> opinion, *see Therrien [v. Berryhill]*, [No. 16-cv-185-LM], 2017 WL 1423181, at
> *5 [(D.N.H. Apr. 21, 2017)], it would seem beyond cavil that a treating source's
> status as a treating source is not one of them. Moreover, it can hardly be doubted
> that when the SSA adopted the rule that it would "give more weight to medical
> opinions from [a claimant's] treating sources," 20 C.F.R. § 404.1527(c)(2), those
> who drafted and adopted the rule understood that treating physicians might have
> sympathy for their patients, and that understanding is necessarily "baked into" the
> rule.

> While there is no need to belabor the point, this court has already registered its
> discomfort with the kind of unsupported speculation about treating-source
> sympathy to which the ALJ gives free rein in his decision. *See Meldrem v.
> Colvin*, No. 16-cv-156-JL, 2017 WL 2257337, at *3 n.9 (D.N.H. May 23, 2017)
> (citing *Halla v. Colvin*, No. 15-cv-30021-KAR, 2016 WL 234802, at *5 (D. Mass.
> Jan. 20, 2016); *Gagnon v. Colvin*, No. 1:15-cv-273-DBH, 2016 WL 403063, at *4
> (D. Me. Jan. 13, 2016)). And this court is far from alone in finding such
> speculation to be unpersuasive and decidedly unhelpful. *See, e.g., Sunshine v.
> Berryhill*, No. 16-cv-446-LM, 2018 WL 582576, at *5 n.6 (D.N.H. Jan. 29, 2018)
> (citing *Hill v. Astrue*, Civ. No. 12-30018-KPN, 2012 WL 5830707, at *4 (D.
> Mass. Nov. 15, 2012)); *George v. Colvin*, Civ. No. 13-10810-TSH, 2016 WL
> 8710428, at *9 (D. Mass. Sept. 30, 2016) (citing *Gonzalez ...*, 2012 WL 2914453,

at *3 … ).  In short, it is sufficient to say that the court is entirely unmoved by the ALJ's ad hominem suggestion of bias on the part of [Plaintiff's] treating sources.

*Coutu v. Berryhill*, Civil No. 17-cv-003-JL, 2018 WL 1293139, at *5-6 (D.N.H. Mar. 13, 2018).[2]

The ALJ's other reasons for refusing to give weight to opinions from B.'s treating

medical sources also fall short.  The ALJ is wrong that these letters are from "less than

acceptable medical sources" (A.R. 35).  Dr. Chua, as B.'s treating pediatrician, qualifies as an

acceptable medical source.  *See Armata v. Berryhill*, No. 3:17-CV-30054-KAR, 2018 WL

4829180, at *15 (D. Mass. Oct. 4, 2018) ("'[L]icensed physicians, licensed or certified

psychologists, and other 'acceptable medical sources,' ... qualify as 'treating sources,' whose

opinions generally are entitled to more weight and, under certain circumstances, can be afforded

controlling weight'" (citing *Barowsky v. Colvin*, No. 15-CV-30019-KAR, 2016 WL 634067, at

*6 (D. Mass. Feb. 17, 2016); quoting 20 C.F.R. §§ 404.1502, 404.1513)).  And, although Ms.

Krzyzek and Ms. Gordon do not qualify as so-called "treating sources," they qualify as "other

sources" whose opinions can be "given equal or greater weight than an 'acceptable medical

source,' depending on the facts of the case."  *Barowsky*, 2016 WL 634067, at *6 (citing *Taylor v.*

---

[2] The ALJ's approach to opinion evidence from a treating source is illogical.  It is well-established that a claimant has the burden of showing that he or she is disabled, and that an ALJ generally is required to give substantial weight to opinion evidence about symptoms and limitations from a treating source, particularly when that source is a licensed physician.  Thus, some of the most compelling evidence a claimant can proffer of symptoms and limitations that might support a finding of disability is opinion evidence from a treating physician or other care provider.  It makes little sense to place a burden of persuasion on a claimant, then categorically reject treating care provider evidence, which the SSA treats by regulation as likely to be highly probative, because the evidence was obtained to support an application for disability benefits.  *Cf. Gonzalez Perez v. Sec'y of Health & Human Servs.*, 812 F.2d 747, 749 (1st Cir. 1987) (recognizing that it was "quite common" for a claimant to "obtain further medical reports, after a claim [was] filed, in support of such a claim" and stating that, for an ALJ to discount such opinions, "[s]omething more substantive than just the timing and impetus of medical reports" is required).  There are analytically sound means for testing such evidence, none of which were employed in this case.

*Astrue*, 899 F. Supp. 2d 83, 88 (D. Mass. 2012)).  Moreover, it is not accurate to say, as the ALJ did, that none of these letters express much more than a need for structure.  Dr. Chua's February 2017 letter – to which the ALJ made no reference – summarized recent neuropsychiatric testing and included substantive statements about Plaintiff's impairments, symptoms, and resulting limitations.  In contending that the ALJ's error in his approach to treating source opinion evidence was harmless, the Commissioner also overlooks the contents of Dr. Chua's February 2017 letter.

The Commissioner is correct that while it is "impermissible for an ALJ to disregard a treating source's opinion merely because it was solicited by the claimant's attorney, … an ALJ's decision 'can still pass muster if the other reasons given to accord medical reports little weight are adequately supported.'"  *Lobov v. Colvin*, Civil No. 12-40168-TSH, 2014 WL 3386567, at *14 (D. Mass. June 23, 2014) (quoting *Rodriguez v. Astrue,* 694 F. Supp. 2d 36, 45 (D. Mass. 2010)).  Here, the ALJ's failure to offer a legally valid reason for his rejection of treating source opinion evidence was not harmless as this error was compounded by other significant errors of law.  As Plaintiff contends, the ALJ failed to identify anxiety as a serious impairment, although the record was replete with references to anxiety and PTSD and symptoms associated with anxiety (*e.g.*, A.R. 394-95, 722, 754, 776, 802).  Furthermore, and just as significantly, the ALJ failed to identify a speech and language impairment as a serious impairment, although B.'s application identified communication deficits and a limited ability to retain information and progress in learning as areas of concern and each of the DDS reviewers found that B. had ADHD

*and* a speech and language impairment that qualified as severe based on B.'s application and

school and medical records (A.R. 110, 127) and analyzed the case accordingly.[3]

The bar for finding an impairment to be severe is low. "Step two is a de minimis

screening device of claims for benefits, where 'a finding of "non-severe" is only to be made

where medical evidence establishes only a slight abnormality or combination of abnormalities

which would have no more than a minimal effect on an individual's ability to [function].'" *Dunn*

*v. Colvin*, No. 15-CV-13390, 2016 WL 4435079, at *8 (D. Mass. Aug. 19, 2016) (quoting

*McDonald v. Sec'y of Health & Human Svcs.*, 795 F.2d 1118, 1124-25 (1st Cir. 1986)). An error

to list impairments at step two is harmless if an ALJ finds, as he did in this case, that the claimant

suffers from other severe impairments; the ALJ continues, as he did in this case, with the

sequential evaluation process; *and* the ALJ considers the omitted impairments at other steps of

the evaluation process, which he did not do. *See Jackson ex rel. K.J. v. Astrue*, 734 F. Supp. 2d

1343, 1361 (N.D. Ga. 2010). "In determining whether a claimant's impairment or combination

of impairments functionally equal the severity of a listing in Appendix 1, the ALJ must consider

the combined effect and combined impact of all of the individual's impairments." *I.V. v.*

*Berryhill*, Civil Action No. 16-11667-DJC, 2017 WL 3401262, at *11 (D. Mass. Aug. 8, 2017)

(citing 20 C.F.R. § 416.926a(a); *Nieves v. Sec'y of Health & Human Servs.*, 775 F.2d 12, 14 (1st

---

[3] It is possible that the ALJ believed that B.'s speech and language deficits were a function of her ADHD and that he therefore did not need to treat B.'s well-documented speech and language deficits as a separate impairment even though the records showed that these impairments had more than a minimal effect on B.'s ability to function. If that is the case, it was an error. First, the ALJ did not explain his reasons for ignoring B.'s speech and language impairment, so that the court cannot tell if this was his reasoning. Second, he did not point to any medical record that identified B.'s speech and language impairments as a function of ADHD. If he reached this conclusion without the support of any medical opinion evidence, that conclusion would be in violation of the precept that "'an ALJ as a lay person is not qualified to interpret raw data in the medical record.'" *Smith v. Berryhill*, 370 F. Supp. 3d 282, 288 (D. Mass. 2019) (quoting *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)).

Cir. 1985)).  The ALJ's omissions at step two were not harmless in this case because, while the ALJ summarized the evidence in the record, including evidence relevant to Plaintiff's anxiety and significant deficits in speech and language, his decision does not show that he factored in these impairments when he considered whether B.'s impairments functionally equaled a listed impairment.  *See R.J. v. Astrue*, No. 1:08-cv-1416-DFH-TAB, 2009 WL 2413924, at *6-7 (S.D. Ind. July 24, 2009) (concluding that the ALJ's step two errors were not harmless where they continued to affect the ALJ's analysis of whether the claimant's combined impairments functionally equaled a listed impairment).

The fundamental deficiency in the ALJ's decision is his failure to "adequately explain the reasoning behind his finding[s] that [B.] had less than marked limitations in the domain[s] of acquiring and using information [and attending and completing tasks], and, therefore, the court cannot determine whether th[ese] finding[s] are supported by substantial evidence."  *Lyons ex rel. X.M.K.L. v. Astrue*, Civil Action No. 12-30013-KPN, 2012 WL 5899326, at *4 (D. Mass. Nov. 26, 2012).  In concluding that B. had a less than marked limitation in acquiring and using information, the ALJ stated that B. "has mild deficits in Core Language with average receptive abilities."  While this statement may be accurate, so far as the court has been able to determine, it does not appear in these terms in Exhibit 24E in the administrative record, the *sole* exhibit cited by the ALJ in support of his finding that B. had less than marked limitations in the domains of acquiring and using information (A.R. 464-94).  Findings and conclusions in the exhibit on which the ALJ relied included, from her special education teacher, that B. would continue to need services through the sixth grade and might need additional support for reading comprehension (A.R. 471).  Test results varied widely and indicated that B. was below average in verbal comprehension and in the area of "significant concern" for "working memory" (A.R.

473).  "English Language Arts" was deemed an area of the general curriculum affected by B.'s disabilit(ies) (A.R. 474).  She would continue to need special education services because, without small group instruction, "her progress would be limited" (A.R. 479).   The ALJ's exclusive reliance on this exhibit raises as many questions than it answers.  This incomplete characterization of the record evidence on which the ALJ relied "calls into question the validity of both the ALJ's functional equivalence determination, and the ALJ's decision as a whole." *R.S. ex rel. Herrera v. Berryhill*, 357 F. Supp. 3d 1033, 1040 (C.D. Ca. 2019) (citing *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir. 1999); *Reddick v. Chater*, 157 F.3d 715, 722-23 (9th Cir. 1998); *Lesko v. Shalala*, No. 93 CV 2210 (ARR), 1995 WL 263995, at *7 (E.D.N.Y. Jan. 5, 1995)).

The ALJ's analysis of the domain of attending to and completing tasks is similarly deficient (A. R. 37-38).  The ALJ again relied exclusively on Exhibit 24E to support his finding that B. had less than a marked limitation in attending to and completing tasks (A.R. 38).  The ALJ acknowledged that, in Exhibit 24E, B.'s teachers noted B.'s serious problems in refocusing to tasks when necessary and in focusing long enough to finish assigned activities or tasks (A.R. 38, 466).  He found that B.'s medication for ADHD and her IEP were sufficient to give her any assistance she required in attending to and completing tasks.  He did not acknowledge test results reflected in Exhibit 24E that, notwithstanding her medication and her IEP, placed her in the significant range of concern for initiation and planning and organization and identified inefficiencies in areas of executive functioning (A.R. 473, 490).

It was inappropriate for the ALJ to rely on the structure provided by B.'s IEP in assessing B.'s ability to focus and maintain attention and begin, carry through, and complete activities.  "Progress under an IEP does not equate to success as compared to non-disabled children."

*Simmons ex rel. L.H. v. Berryhill*, No. 17 C 00065, 2018 WL 1138555, at *4 (N.D. Ill. Mar. 2, 2018) (citing *A.H. ex rel. Williams v. Astrue*, No. 09 C 6981, 2011 WL 1935830, at *11 (N.D. Ill. May 18, 2011)). "The regulations emphasize that a child who receives special education accommodations cannot automatically be compared to non-impaired children because 'good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments.'" *Saracco ex rel. T.H. v. Berryhill*, No. 15-C-6208, 2017 WL 6039916, *7 (N.D. Ill. Dec. 6, 2017) (citing 20 C.F.R. § 416.924a(b)(7)(iv)). Indeed, in *Lyons ex rel. X.M.L.K.*, 2012 WL 5899326, at *6, the court found that "[t]his factor, contrary to the ALJ's analysis, actually weighs against his finding."

In addition to questions raised by the ALJ's selective treatment of the contents of Exhibit 24E, the ALJ failed, so far as appears from his decision, to comply with the directive in 20 C.F.R. § 416.924a(a) to consider all of the relevant evidence in B.'s case record, which included pertinent information from medical sources, such as records from the child's pediatrician and occupational therapist, and from nonmedical sources, such as the child's legal guardian and teachers, in conducting the functional equivalence analysis. *See Lyons ex rel. X.M.L.K.*, 2012 WL 5899326, at *4; *see also R.S. ex rel. Herrera*, 357 F. Supp. 3d at 1041 (stating that remand was appropriate given the ALJ's apparent inadequate consideration of other significant evidence in the record). The ALJ did not explain what weight, if any, he assigned to observations by teachers that, for example, B. lacked the ability to remember spoken directions or academic instructions of increasing complexity and to learn new vocabulary and subject content (A.R. 345); that working memory was an area of significant concern (A.R. 428); that B. had obvious problems in reading and comprehending written material (A.R. 465, 501); and that she had executive functioning deficits (A.R. 596-97). A teacher questionnaire completed shortly before

the 2017 hearing assessed B. as having serious problems in the domain of acquiring and using information, specifically with "learning new material, comprehending and doing math problems, [and] providing organized oral explanations and adequate descriptions" (A.R. 33). In the domain of attending and completing tasks, the teacher noted a "serious problem in focusing long enough to finish assigned activity or task, and in refocusing to task when necessary," as well as with "completing class/homework assignments, completing work accurately without careless mistakes, working without distracting self or others, and working at a reasonable pace/finishing on time" (A.R. 33-34). The ALJ failed to explain what weight, if any, he assigned to such observations by B.'s teachers (e.g., A.R. 324, 402, 428, 466), or to the evidence from B.'s grandmother and guardian, who testified that B. could not remember how to perform the simplest of chores, such as putting away the dishes, from day to day, and that caring for her was an exercise in "repeat, and repeat, and repeat" because B. did not retain the routine steps it took to get out the door to school every day, and that the grandmother had put post-its all over the house to remind B. where things were and where things belonged (A.R. 71-72, 81).

"Granted there may very well be sufficient evidence that [B.] has less than marked limitations" in the domains discussed above. *Lyons ex rel. X.M.L.K.*, 2012 WL 5899326, at *6. Two DDS reviewers concluded – albeit on a less complete record than the record before the ALJ – that B. did not have marked limitations in two domains of functioning or an extreme limitation in one domain (A.R. 103-15, 117-33),[4] and neuropsychiatric test results point to strengths in

---

[4] The court acknowledges that the ALJ included a reference to the DDS reviews in his decision (A.R. 35). He did not, however, explain what weight, if any, he assigned to those reviews, which, as previously noted, identified a speech and language impairment as among B.'s severe impairments, along with ADHD, and did not classify her sleep apnea as severe. In view of these discrepancies between the DDS reviews and the ALJ's findings, the court cannot infer that the ALJ relied on the DDS findings in reaching his conclusions or what weight, if any, he assigned to the DDS findings.

some areas that may be counterweights to B.'s deficits, although aspects of the record suggest that those deficits may create more significant barriers as B. ages and faces greater complexities at school, at home, and in the community.  In summary, however, "the medical [and other] records in this case do not lead to one conclusion that the ALJ can draw through common sense. …  This is not a case where the accumulation of evidence points to a single and obvious conclusion that is merely unstated."  *I.V.*, 2017 WL 3401262, at *12 (distinguishing *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327 (1st Cir. 1990)).

"'The hearing officer is not required to – nor could he reasonably – discuss every piece of evidence in the record.'"  *Johnson v. Colvin*, 204 F. Supp. 3d 396, 410 (D. Mass. 2016) (quoting *Sousa v. Astrue*, 783 F. Supp. 2d 226, 234 (D. Mass. 2011); citing *Foster v. Colvin*, Civil Action No. 15-11841-DJC, 2016 WL 3360574, at *10 (D. Mass. June 16, 2016)).  Here, however, the ALJ "failed to link his specific domain decision to [virtually all of the evidence] of . . . record or to provide an evidentiary basis for the very different criteria that apply to each of the various domains.  It is well established that an ALJ 'must articulate at some minimal level his analysis of the evidence.'"  *A.H. ex rel. Williams v. Astrue*, No. 09 C 6981, 2011 WL 1935830, at *11 (N.D. Ill. May 18, 2011) (quoting *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994)).  Moreover, the ALJ's domain analysis did not consider how B. performed in comparison to her non-impaired peers.  *See id.* at *12.  The court is left to speculate how the ALJ weighed the evidence and how he reached the conclusions he did.  "'Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand ... for further explanation.'"  *Coggon v. Barnhart*, 354 F. Supp. 2d 40, 59 (D. Mass. 2005) (quoting *Crosby v. Heckler,* 638 F. Supp. 383, 385–86 (D. Mass. 1985)); *see also Lyons ex rel. X.M.L.K.*, 2012 WL 5899326, at *7 (citing *Seavey v. Barnhart*, 276 F.3d 1, 12 (1st Cir. 2001)

("When an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its action, the reviewing court ordinarily should remand the case to the agency.")).

V.  CONCLUSION

For the reasons stated above, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No 14) is GRANTED insofar as the case is remanded to the Commissioner for further administrative proceedings, and Defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. No. 16) is DENIED.  The Clerk's Office is directed to close the case on this court's docket.

It is so ordered.

Dated: January 30, 2020

Katherine A. Robertson
KATHERINE A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE